UNITED STATES of America,
Plaintiff–Appellee,

v.

David Patrick WILLIAMS and Charles E. Froschauer, Defendants–Appellants.

Nos. 87–2234, 87–2257.

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1988.
Decided Sept. 20, 1988.

1219

Eileen A. Kamerick, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., J. Jeffrey Weisenfeld, Goldberger & Dubin, New York City, for defendants-appellants.

Robert T. Coleman, Asst. U.S. Atty., E. St. Louis, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and COFFEY, Circuit Judges.

BAUER, Chief Judge.

David Patrick Williams and Charles E. Froschauer dealt drugs from Florida to customers in Illinois. This story begins in April, 1985, when Fred Crook and two others flew from Chicago to Miami to purchase marijuana from Williams and David Schonback, with whom Crook had had previous drug dealings. Although the marijuana deal fell through, the parties discussed cocaine deals, which soon materialized. In May or June, 1985, Crook purchased two kilograms of cocaine from Schonback, who obtained the cocaine from Williams. In October or November, 1985, Crook arranged another cocaine purchase

and, this time, Harley Barton drove from Illinois to Sarasota, Florida, to pick up four kilograms, two for Crook and two for Schonback. Barton did the same for Crook in late 1985 or early 1986, and again in April, 1986. Each time Barton went to Florida to deliver money and pick up cocaine, he met Williams, who sometimes participated in the transactions. Finally, in May, 1986, Tom Miks drove to Sarasota for Crook and returned to Illinois with five kilograms of cocaine, some of which was kept by Crook at a stash house outside Collinsville, Illinois.

All was not well, however. It turns out that Williams was delivering the cocaine to Schonback and Crook for Froschauer, who by May 9 or 10, 1986 had not received all the money he was due. At about that time, Froschauer first met with Gregory Taylor, a man variously described by both defendants and the government as experienced in the arts of collection, private investigation, and murder. Froschauer told Taylor that he had some customers in Illinois who were late on payments and asked Taylor if he would help collect the money during an upcoming trip to Illinois. To complicate matters for Froschauer and Williams, Crook, Barton, and others were arrested on May 28, 1986 at the Collinsville stash house, after which Crook and Barton both entered into plea agreements with the government and agreed to cooperate in the ensuing investigation. At the time of his arrest, Crook owed $50,000.00 to Schonback, who, through Williams, owed Froschauer the same amount. Worse yet, Schonback was indicted later that summer. Upon learning of his indictment, Schonback called Williams and told him the unsettling news. Williams, understandably, was worried about his exposure to criminal prosecution.

And the plot continued to thicken. On July 29, 1986, Froschauer met again with Taylor and gave him, along with other information, a piece of paper containing the docket number of the criminal case in which Schonback had been indicted and the name of the United States Attorney for the Southern District of Illinois. Froschauer and Taylor also discussed intimidating and

perhaps killing witnesses in Schonback's case. Later, Froschauer told Williams that he had asked Taylor to meet with Schonback to discuss Schonback's arrest and to collect some money. Froschauer told Williams that Taylor would investigate the Schonback case, see what statements had been made, and interview witnesses. Because a possible witness against Schonback was Harley Barton, Williams provided Froschauer with a written description of Barton and the vehicles that he drove. Taylor then went to Chicago and, on or about August 6, 1986, met with Schonback, with whom Taylor also discussed eliminating witnesses through murder.

After talking with Schonback, Taylor went to North Carolina where, after twelve to fourteen days of reflection, he experienced a change of heart and decided to cooperate with the government. Taylor contacted the United States Attorney's Office for the Southern District of Illinois and the FBI in Carbondale, Illinois. Thereafter, Taylor taped numerous phone conversations between Schonback, Williams, Froschauer, and himself that, together, formed the basis for the government's obstruction-of-justice case against Williams, Froschauer, and Schonback. The whole business began to show how little one can trust even the most evil of companions.

Williams and Froschauer were indicted in the Southern District of Illinois on February 27, 1987. Both were charged with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1) and numerous obstruction-of-justice-related offenses. For purposes of this appeal, the most important of the latter charges were conspiracy to obstruct justice in violation of 18 U.S.C. §§ 371 and 1503 (Count 2), and conspiracy to tamper with witnesses in violation of 18 U.S.C. §§ 371 and 1512(a)(2)(A), 1512(a)(2)(D), 1512(a)(3) (Count 5). That same day, Schonback also was charged with various obstruction-of-justice counts, to which he pled guilty before Williams's and Froschauer's trial.

The jury convicted Williams on Counts 1, 2, and 5. On July 24, 1987, he was sentenced to 14 years imprisonment on Count

1, and two four-year sentences on Counts 2 and 5 to run concurrently with each other but consecutive to Count 7. He also was fined $50 on each count. The jury also convicted Froschauer on Counts 1, 2, 5, as well as many others. On July 31, 1987, he was sentenced to many, many years in prison and fined $50 on each count. Both Williams and Froschauer appeal from these convictions, alleging numerous errors on the part of the district court.

## I.

### A.

First, Williams argues that there was insufficient evidence to convict him of conspiracy to obstruct justice (Count II) or conspiracy to tamper with witnesses (Count V). In a nutshell, he claims that, although Froschauer, Schonback, and Taylor may have conspired to obstruct justice, there was no evidence that Williams was part of that conspiracy.

We will reverse a conviction for lack of evidence only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983). Moreover, we will not review questions concerning the weight of evidence or the credibility of witnesses; such questions are left to the sound discretion of the trier of fact. *Id.* Once a defendant has been convicted of the crime charged, "the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). This includes, in conspiracy cases, circumstantial as well as direct evidence. *Redwine*, 715 F.2d at 319.

We agree with the government that, when viewed in context, there was sufficient evidence from which a rational jury could conclude that Williams was part of a conspiracy to obstruct justice. Initially, we note that Williams had a stake in the conspiracy to obstruct justice because of his participation in the drug conspiracy. The evidence at trial showed that Williams worked for Froschauer in Florida supplying cocaine through Schonback to Fred Crook in Illinois. When Schonback was indicted for conspiracy to distribute cocaine in July, 1986, among the witnesses to testify at his trial were Crook, Crook's wife, Miks, and Barton. Williams, of course, had delivered cocaine and received money from Barton on several occasions in 1986. At the time of Schonback's trial, therefore, Barton's testimony posed a threat to Williams.

Moreover, a careful review of the evidence could lead a jury to conclude that Williams played a larger role in the obstruction-of-justice conspiracy than he lets on. We begin on July 29, 1986, when Taylor met with Froschauer, from whom he obtained, *inter alia*, a piece of paper containing Schonback's criminal case number, the name of the United States Attorney for the Southern District of Illinois, and instructions to talk to Schonback in Chicago. Froschauer and Taylor also discussed the intimidation or murder of witnesses. At that time, Schonback had only met Froschauer twice, each time before Schonback's indictment. Schonback had known Williams since 1980, however, and had called Williams after he was indicted and told Williams about the case against him. And it was Williams who called Schonback at the end of July to tell him that Taylor was coming to see him. Taylor did meet with Schonback on August 6, 1986, and the two also discussed killing or intimidating witnesses. After that meeting, Schonback was supposed to call Williams, and Taylor was to get in touch with Froschauer. Schonback also testified that he had discussions with Williams concerning intimidating witnesses after his first meeting with Taylor.

In addition, contrary to his assertion, the taped conversations hardly exculpate Williams. For example, on August 25, 1986, Taylor called Froschauer when Williams was present. During that conversation, Froschauer discussed Williams's exposure to Barton, even though he had not

previously talked to Schonback. Williams also got on the line and, with Taylor, talked of finding the "right target" and about getting discovery documents from Schonback's criminal case. Taylor also told Williams that "if these guys ... aren't available, we can do as Charles and I discussed earlier, intimidate families...." Williams did not reject the idea. Later in the conversation, when Taylor asked how far they wanted to proceed, Williams responded, "pretty far ... pretty damn far." Taylor responded by saying "that's how I make my money, Dave." When Williams asked about costs, Taylor told him it depended on whether the witnesses were under protection and said it could be "ten or it could go as high as twenty, twenty-five," to which Williams responded "okay." Taylor told Williams it might be as easy as "stoppin' and seein' the guys, you know, sister, and mom." Taylor also said he would go and sit in the courtroom during Schonback's case and asked for operating capital, to which Williams responded, "okay." None of these events really qualify Williams for the role of an innocent "patsy."

Taylor thereafter met with Schonback, who gave Taylor the name and location of Fred Crook and his wife, and indicated he wanted them killed. On August 28, 1986, Taylor called Froschauer. During that conversation, Taylor advised Froschauer of what Schonback wanted done and Froschauer asked the fee for killing both Crook and his wife, to which Taylor responded "ten per head." Williams was with Froschauer during the conversation and his voice was heard in the background when Froschauer asked him if Schonback tried to get a hold of him the previous night. On August 30, 1986, according to prior arrangement, Taylor called Froschauer, who told Taylor that Williams was in the process of calling Taylor. Williams thereafter did call Taylor and, during their discussion, indicated that he was not worried about the Crooks but about Barton. Taylor suggested targeting only Barton but making Schonback think that others would be taken care of too, to which Williams replied, "that's fine." Williams told Taylor he would get Taylor some money and that he had told Schonback the problem had cost him everything he had. Later, when Taylor met again with Froschauer in Florida, Froschauer gave Taylor $5,000, a copy of Barton's statement to the FBI which he had received from Williams, and a piece of paper describing Barton and the vehicles he drove. That piece of paper had Williams's fingerprints on it and was in Williams's handwriting.

We could, but need not, go further. We cannot conclude, based on this evidence, that no rational trier of fact could have convicted Williams of conspiracy to obstruct justice. The evidence shows that Williams knew the other conspirators well and certainly had a motive to join, and a stake in the outcome of, the conspiracy. Although Williams is not a direct participant in many of the taped conversations, he was referred to often and, when he did participate in the conversations, his comments were consistent with the design of the conspiracy. In the end, it was Barton who was Taylor's target, it was Williams who had exposure to Barton, and it was Williams who provided Froschauer and, in turn, Taylor, with a description of Barton and the vehicles he drove. Thus, the evidence was sufficient to convict Williams of conspiracy to obstruct justice.

## B.

█ Williams, who testified in his own defense at trial, also presses a Fifth Amendment claim. He argues that the district court's refusal to limit cross-examination of his testimony to matters relating solely to the obstruction-of-justice counts (and not the conspiracy-to-distribute-cocaine count) violated his Fifth Amendment right to be free from compulsory self-incrimination. We disagree.

Federal courts consistently have held that a defendant who takes the stand is subject to cross-examination on matters affecting credibility and matters reasonably related to the subject matter of his direct testimony. *Neely v. Israel*, 715 F.2d 1261, 1263–64 (7th Cir.1983), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184

(1984). The question whether a defendant has put a matter in dispute during his direct examination is subject to broad interpretation. *See United States v. Havens,* 446 U.S. 620, 628, 100 S.Ct. 1912, 1917, 64 L.Ed.2d 559 (1980). Despite Williams's claim that testimony regarding "counts II–XIII was not reasonably related to count I," we think, as did the district court, that the conspiracy to distribute cocaine and the conspiracy to obstruct justice were "inextricably interwoven." The former, of course, was what spurred the latter; Williams's participation in the drug conspiracy was the reason, or motivation, for his participation in the conspiracy to obstruct justice. We hold that the district court did not err in allowing the government to cross-examine Williams on all counts in the indictment.

### C.

Froschauer also presses two arguments of his own, only one of which merits our attention. He argues that the district court deprived him of his Sixth Amendment confrontation rights by limiting his cross-examination of Taylor. Froschauer claims that the district court deprived him of any opportunity to show that Taylor was experiencing his own legal difficulties and that he therefore had a motive for testifying falsely.

Not true. "The confrontation clause promotes accuracy in the trial process by ensuring that the trier of fact has a satisfactory basis for evaluating the truth." *Barker v. Morris,* 761 F.2d 1396, 1399 (9th Cir.1985). The right to confront witnesses guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense might wish. *Delaware v. Fensterer,* 474 U.S. 15, 18, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). "Trial judges retain wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety or interrogation that is repetitive or marginal-

ly relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1985). Thus, the sufficiency of cross-examination turns on "whether the jury had sufficient information to make a discriminating appraisal of the witness' motive and bias." *United States v. Rodgers,* 755 F.2d 533, 548 (7th Cir.), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985). Our review of the record convinces us that Froschauer had ample opportunity to reveal Taylor's possible motives or biases. Counsel for Froschauer did indeed question Taylor concerning his own impending legal troubles as well as his association with others involved in the legal process. The cross-examination of Taylor was lengthy and restricted only when it became repetitive or irrelevant. The district court did not abuse its discretion in curtailing the cross-examination of Taylor.

### II.

### A.

Both Williams and Froschauer contend that the district court erred in refusing motions to sever their trials, each asserting that their defenses were mutually exclusive and conflicting, but for different reasons. Williams further argues that the court's refusal to sever violated his Sixth Amendment right to confront witnesses and that the jury was unable to compartmentalize the evidence at trial. We reject each of these contentions.

Initially, we note that the decision whether to grant a motion for severance is addressed to the sound discretion of the trial court, and we will reverse its decision only if that discretion is clearly abused. *United States v. Moschiano,* 695 F.2d 236, 245 (7th Cir.1982), *cert. denied,* 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983). "Also, in exercising its discretion, the trial court must give due deference to the strong public interest in favor of a joint trial, particularly where, as here, the indictment charges a conspiracy which may be proved against both defendants by the same evidence and which results from the same act or similar sever of acts." *Id.* at

246. To prevail on a motion for severance, then, a defendant must establish such prejudice that a joint trial would be unfairly prejudicial. *Id.* This is a heavy burden; a mere showing that a separate trial would result in a better chance of acquittal is not enough. *Id.* Specifically, mutually antagonistic defenses mandate severance only when the acceptance of one party's defense precludes acquittal of the other. *Id.*

### 1.

██ Williams's severance argument goes like this: His primary defense was that he was not a party to any conspiracy to obstruct justice or intimidate witnesses. Froschauer's defense in contrast, was exclusively one of entrapment. Froschauer, therefore, inferentially admitted the existence of a conspiracy to obstruct justice. Thus, to believe Williams's defense, Williams argues, the jury necessarily had to disbelieve Froschauer's defense. This is not true, however, because the jury could have believed that a conspiracy existed but that Williams was not a part of it and, in doing so, believed both defendants' defenses. Even under Williams's characterization of his and Froschauer's defenses, then, they were hardly mutually exclusive. Since severance was not mandated, therefore, we cannot conclude that the court abused its discretion in refusing to grant Williams's motion.

### 2.

██ Unlike Williams's severance argument based upon antagonistic defenses, which focuses on the obstruction-of-justice charges, Froschauer's severance argument concerns count one, the drug charge. According to Froschauer, his defense was that, although he was involved in drug trade, he had not dealt with those persons who had brought drugs into Illinois. Thus, Froschauer argues, any testimony from Williams that Williams obtained his drug supply from Froschauer would be antagonistic to his defense. This is nonsense. As Froschauer conceded at oral argument, the government had evidence apart from Williams's testimony of Froschauer's drug dealings in Florida and his connection with

the defendants in Illinois, enough so that Froschauer could be prosecuted for those activities in the Southern District of Illinois. In any case, although Williams testified that he knew the cocaine he sold to Crook and Schonback was going to be resold, Williams also testified that he did not know it was going to be resold in Illinois. Williams's story, therefore, did not even conflict with Froschauer's. Based on Froschauer's own arguments and concessions, then, we refuse to conclude that the district court abused its discretion in refusing to grant his motion to sever.

### 3.

██ Williams also argues that the district court's refusal to sever violated his Sixth Amendment right to confront witnesses. Because tape-recorded incriminating statements by Froschauer were admitted at trial and because Williams could not call his codefendant Froschauer to the stand and cross-examine him, Williams argues that a joint trial was prohibited by *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton*, the Supreme Court held that the admission of a nontestifying codefendant's out-of-court confession inculpating the defendant violated the defendant's Sixth Amendment right to cross-examine. *Id.* at 123, 88 S.Ct. at 1621. The Court in *Bruton*, however, dealt with a confession that clearly was inadmissible hearsay as to the nonconfessing defendant and does not control where, as here, the codefendant's statements complained of clearly are admissible as statements made by a co-conspirator in furtherance of a conspiracy. *See id.*, 391 U.S. at 128 n. 3, 88 S.Ct. at 1623 n. 3. Thus, even if Williams had been tried separately, the inculpatory evidence he complains of still would have been admissible. Nor can we accept Williams's argument that the court should have ordered separate trials to enable Williams to call Froschauer to the stand. In considering that argument below, the court was free to weigh such factors as whether the codefendant's testimony would be exculpatory, whether the codefendant would, in

fact, testify, and whether the testimony would bear on the defendant's case. *United States v. Melton,* 689 F.2d 679, 686 (7th Cir.1982). Although Williams did allege in his motion for severance that Froschauer might provide exculpatory evidence, the district court was not satisfied with this allegation, and we do not believe it erred in denying the motion.

### 4.

■ Finally, Williams contends that the district court's refusal to sever denied him a fair trial because the jury was unable to compartmentalize the evidence as it applied to him. Juries, however, are presumed capable of sorting through the evidence and considering the cause of each defendant separately. And although this case involved multiple counts, several codefendants, and several tape recordings admitted into evidence, we do not think that the case was of such a magnitude that the jury was unable to follow the court's instructions with respect to compartmentalizing the evidence as it related to each defendant. If anything, the jury's verdict shows that it was capable of doing so.

### B.

■ Both appellants also argue that the district court erred in refusing to dismiss all the obstruction-of-justice counts on the ground that the government's actions were so outrageous they amounted to a due process violation. They argue that only after some twenty conversations over a one-month period, during which Taylor repeatedly reminded Froschauer and, in some instances, Williams, of their vulnerability to the witnesses in Schonback's case, was Froschauer finally persuaded to permit Taylor to attempt to thwart the government's investigation. According to Froschauer, the government's and Taylor's actions were outrageous not only because Taylor orchestrated the scheme to obstruct justice, but also because Taylor and the government jeopardized the safety of many people. There was no guarantee, argues Froschauer, that once Taylor persuaded them to take action against the witnesses in Schonback's case, the appellants would follow Taylor's urgings to rely on *him.* Froschauer thus asks: What if he and Williams had employed someone else to take action?

This unusual argument, original and interesting as it might be, must fail. We noted in *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.1983), that the Supreme Court has not given much content to the principle that governmental misconduct may bar prosecution even absent any other deprivation of a defendant's constitutional rights. Indeed, the three-justice plurality in *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed. 2d 113 (1976), seemed to reject such a notion, stating that "[t]he remedy of the criminal defendant with respect to acts of government agents, which, far from being resisted, are encouraged by him, lies solely in the defense of entrapment." *Hampton,* at 490, 96 S.Ct. at 1650. Froschauer, of course, tried but failed to persuade the jury that he was entrapped by the government. In any case, as we observed in *Kaminski,*

> an examination of the post-*Hampton* cases decided by the courts of appeals indicates that due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental conduct must be truly outrageous before due process will prevent conviction of the defendant.
>
> "In seeking to detect and punish crime, law enforcement agencies frequently are required to resort to tactics which might be highly offensive in other contexts. Granting that a person is predisposed to commit an offense, we think that it may safely be said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process...."

*Kaminski,* 703 F.2d at 1009 (quoting *United States v. Quinn,* 543 F.2d 640, 648 (8th Cir.1976).

With this in mind, we do not believe the government crossed the line to outrageous conduct in this case. When the government learned of a potential plot to influence or even murder government witnesses, it certainly had sufficient reason to resort to the use of an informant, even one as unattractive as Taylor. In our view, the conduct here falls far short of that in the few cases in which other courts have recognized an outrageous-government-conduct defense. *See e.g. United States v. Twigg*, 588 F.2d 373 (3rd Cir.1978) (government informer contacted defendant about manufacturing narcotics; government supplied chemicals, glassware, and farmhouse used for manufacturing; informer did lion's share of the manufacturing while defendant's involvement was minimal); *United States v. Archer*, 486 F.2d 670 (2nd Cir. 1973) (federal agents deceived court and grand jury by staging sham crime to investigate corruption in state prosecutor's office); *Greene v. United States*, 454 F.2d 783 (9th Cir.1971) (government agent initiated contact with defendants and used veiled threats over extended period of time to convince them to produce illegal whiskey; supplied ingredients and was only customer of defendants). We therefore reject the defendants' argument that their convictions should be reversed on the ground of outrageous government conduct.

### C.

 Finally, Williams and Froschauer argue that their convictions on both Counts II (conspiracy to obstruct justice in violation of 18 U.S.C. §§ 371 and 1503) and V (conspiracy to tamper with witnesses in violation of 18 U.S.C. §§ 371 and 1512(a)(2)(A), 1512(a)(2)(D), 1512(a)(3)) violated their Fifth Amendment double jeopardy rights because, in effect, each count alleged the same conspiracy. *See Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942); *United States v. Tanner*, 471 F.2d 128, 141 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). At oral argument, the government conceded this claim. We therefore vacate these convictions and remand to the district court for an election of counts by the government and for resentencing. We expect that the government will elect Count V, which allows for a tougher penalty than Count II. We therefore think it unnecessary and unwise to consider Williams's argument that 18 U.S. C. § 1503, the basis for the conspiracy to obstruct justice charge in Count II, does not apply to witness tampering.

Affirmed in part and reversed in part. Cause remanded to the district court for such further action as necessary in the light of this opinion.