**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Daniel J. D'ANTONI and Richard Ales, Defendants–Appellants.**

Nos. 88–1237, 88–1364.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 19, 1988.

Decided May 17, 1989.

Mark A. Eisenberg, Eisenberg Law Offices, S.C., Ralph A. Kalal, Kalal & Haber-

mehl, Madison, Wis., for defendants-appellants.

John W. Vaudreuil, Asst. U.S. Atty., Madison, Wis., for plaintiff-appellee.

Before POSNER, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Defendants-appellants Daniel D'Antoni and Richard Ales challenge their convictions for conspiracy to kill a government witness on several grounds. First, they challenge the district court's admission into evidence of testimony about statements made by D'Antoni's brother to a government informant under the co-conspirator exception to the hearsay rule. Second, they argue that admission of these statements was impermissible under Rules 404(b) and 403 of the Federal Rules of Evidence. Third, they charge that the district court erred in admitting several tape-recorded telephone conversations obtained in violation of Wisconsin law. Fourth, D'Antoni charges that his conviction should be reversed because the government's methods of investigating this case constituted outrageous governmental conduct, violating his due process rights. Finally, D'Antoni argues that the evidence was insufficient to convict him. For the reasons discussed below, we affirm the two convictions on all counts.

## I. Facts

Todd D'Antoni ("Todd"), the brother of one of the appellants, gave cocaine to fifteen-year-old Tricia Schuh and fourteen-year-old Rebecca Reynolds in June, 1987. Tricia Schuh ingested the cocaine and died. Todd was charged with distribution of a controlled substance to a person under eighteen years of age. Rebecca Reynolds, who had testified before the grand jury, was to be the prosecution's key witness.

While Todd was incarcerated in the Dane County (Wisconsin) Jail for violating the conditions of his release, he met Ricco Ferguson. Ferguson had been arrested on charges of theft, obstructing justice and driving without a valid license. He was

hoping to "cut a deal" with the government. Between September 14 and September 16, 1987, Todd told Ferguson that he (Todd) and his brother, appellant Daniel D'Antoni ("Dan"), had arranged for someone to be paid $10,000.00 to murder Rebecca Reynolds. Ferguson offered to commit the murder himself for less money, although he never in fact intended to do so. Todd agreed, saying he wanted it done by September 20th. Ferguson spoke with Dan on September 17th. Dan told Ferguson that he had spoken with Todd and that he was working on getting a picture of Rebecca Reynolds but didn't have one yet. Ferguson met with law enforcement officers that same day and agreed to cooperate in an investigation of the plan to murder Rebecca Reynolds.

Over the ensuing few days, Ferguson had several telephone conversations with Todd, Dan and defendant Richard Ales. All of these conversations were recorded on tape. Only Ferguson had consented to this. Ales met twice with Ferguson, once on September 18, 1987 to give him some money, and once on September 19, 1987 to show him where Rebecca Reynolds lived and to give him a description of her. Dan's supposed role in this scheme was to supply the pistol. He claimed at trial, however, that he in fact had no intention of doing so, and merely was pretending to go along with Ferguson to protect his brother. Dan was arrested during a September 20 meeting with Ferguson after he told Ferguson and the undercover policeman accompanying them that he was working on getting the gun and the money but did not have the gun yet. Both Ales and Daniel D'Antoni were convicted of conspiracy to kill a government witness. They appeal their convictions on numerous grounds.

## II. Discussion

### A. Admissibility of Todd D'Antoni's Jailhouse Statements

#### 1. Rule 404(b)

As a preliminary matter, Daniel D'Antoni argues that his brother Todd's statements to Ferguson between September 14 and September 16, 1987 that the two

of them (Todd and Dan) already had hired someone to kill Rebecca Reynolds were inadmissible as evidence of prior bad acts (or crimes) under Fed.R.Evid. 404(b). We agree with the government, however, that this was not a "prior act" at all, but evidence of the crime itself. This is because these statements are "intricately related to the facts of the case," *United States v. Hawkins,* 823 F.2d 1020, 1023 (7th Cir. 1987) (quoting *United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984)). Admissibility of this evidence is governed instead by Fed.R.Evid. 403. *Hawkins,* 823 F.2d at 1023. In that event, the evidence only is admissible if the probative value of statements is not outweighed by their prejudicial effect. As we discuss below, however, we do not think that this evidence was unduly prejudicial.

### 2. *Rule 801(d)(2)(E)*

▮ Defendants also argue that Todd D'Antoni's statements were inadmissible under the co-conspirator exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E). This rule provides:

**(d) Statements which are not hearsay.** A statement is not hearsay if—...

. . . . .

**(2) Admission by party-opponent.** The statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of a conspiracy.

In order to admit evidence under this rule, the district court must find, by a preponderance of the evidence, that: (1) the declarant and the defendant were members of a conspiracy; (2) when the hearsay statement was made; and (3) that the statement was in furtherance of the conspiracy. *United States v. Santiago,* 582 F.2d 1128, 1134 (7th Cir.1978). *See also, e.g., United States v. Kelley,* 864 F.2d 569, 573 (7th Cir.1989); *United States v. Hooks,* 848 F.2d 785, 794 (7th Cir.1988) *and cases cited therein.* Although it used to be the rule in this circuit that the existence of the conspiracy had to be proved by independent

evidence (that is, by evidence other than the proffered hearsay evidence itself), the Supreme Court held in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), that the co-conspirator statements themselves can be used to prove the existence of the conspiracy. *Id.,* 107 S.Ct. at 2781–82. We think that in this case all of these requirements were satisfied. Moreover, we think that the existence of a conspiracy on or before September 14, 1987, is corroborated by other evidence.

The defendants' argument that Todd's statements to Ferguson between September 14 and September 16, 1987, are inadmissible goes something like this: because Ferguson never intended to help Todd, and became a government informant after this conversation, he never agreed to conspire with Todd as a matter of law. *United States v. Escobar de Bright,* 742 F.2d 1196, 1199–1200 (9th Cir.1984). Thus, defendants maintain, Todd's statements only can come in as evidence if a conspiracy can be proved to have existed between him and Dan before these statements were made. We think that a conspiracy existed between the brothers D'Antoni on or before September 14, 1987.

Todd D'Antoni's statements to Ricco Ferguson at the Dane County Jail from September 14 to September 16 themselves show that a conspiracy to kill Rebecca Reynolds existed between Todd and Dan at or prior to that time. Todd's statements to Ferguson, moreover, are corroborated by the later phone conversation of September 17 between Ferguson and Dan, and by the September 18 phone conversation of Todd and Ferguson. *Bourjaily,* 107 S.Ct. at 2781–82. In the September 17 conversation, Dan told Ferguson that he had talked with Todd and was working on getting a picture of Rebecca Reynolds. In the September 18 conversation, Todd told Ferguson that he (Todd) had told Dan to "cancel the other guy and he said no problem." (Gov't Ex. 1–A, at 7). Thus, Todd's statements to Ferguson were admissible under Rule 801(d)(2)(E).

### 3. *Rule 403*

■ Finally, neither defendant was prejudiced under Rule 403 by admission of this evidence. Because of Dan's telephone conversations with Ferguson, and because of his September 20 meeting with Ferguson at which he said he was working on getting the gun and the money, we think that sufficient independent evidence of Dan's participation in the conspiracy exists. Hence, there was no prejudice to Dan D'Antoni by admission of this evidence. *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir.1988).

Defendant Richard Ales also was not prejudiced by the admission of this evidence. He argues that admission of Todd's jailhouse statements to Ferguson imply that he (Ales) knew of the conspiracy to kill Rebecca Reynolds before his conversations with Todd and Ferguson on September 18. In fact, Todd's statements between September 14 and September 16 only relate to Dan's involvement. It was not until Ferguson met with Todd at the Dane County Jail on September 18, that Todd mentioned to Ferguson that he "had a friend that might get the picture [of Rebecca Reynolds]" other than Dan. Later on September 18, Ales participated in a tape-recorded telephone conversation with Ferguson and Todd, in which he first was introduced to Ferguson. Thus, we do not think that defendant Ales was prejudiced by admission of Todd's statements to Ferguson against him. Statements made by a co-conspirator during and in furtherance of a conspiracy are admissible against another co-conspirator, even though the statements were made prior to that co-conspirator's joining of the conspiracy, in order to demonstrate the nature and objectives of the conspiracy. *United States v. Tuchow*, 768 F.2d 855, 868 (7th Cir.1985).

### B. *Admissibility of the Tape–Recorded Conversations*

■ Only Ricco Ferguson consented to the tape-recording of the conversations between him, Todd and Dan D'Antoni, and Richard Ales. The state authorities, moreover, did not obtain a court order permitting the tape-recording. Thus, this evidence would be inadmissible under Wisconsin law in state court. *State ex rel. Arnold v. County Court of Rock County*, 51 Wis.2d 434, 187 N.W.2d 354 (1971). This evidence, however, is admissible under federal law. *See* 18 U.S.C. § 2511(2)(c); *cf. United States v. Eschweiler*, 745 F.2d 435, 436–37 (7th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1188, 84 L.Ed.2d 334 (1985) (one-party consent to electronic monitoring of his conversation with another person does not violate the fourth amendment).

Defendants argue that the federal courts should follow the state law as to admission of evidence obtained by state officials in violation of state law on comity grounds. That is, federal courts otherwise would be encouraging state officials to violate state law. Since the tapes still can be used to investigate the case and there can be testimony as to the conversations at trial, moreover, defendants maintain that the burden on the government is slight.

Defendants do not argue that this evidence was obtained in violation of federal law. They only argue that since this evidence was obtained in violation of state law that it should not be admissible in federal court. We disagree. In a federal criminal prosecution, federal standards govern the admissibility of evidence. *Mealy*, 851 F.2d at 907. In *Mealy*, this court held that in determining whether evidence seized by state officials may be used against a defendant in a federal proceeding, the district court must determine the legality of the search and seizure as if federal officers had executed it. *Id.*

Thus, as long as the tape-recorded conversations are admissible under federal law, which they are here, they are admissible in federal court, even though they might not have been admissible in state court. *See also United States v. Gervasi*, 562 F.Supp. 632, 647–51 (N.D.Ill.1983) (tape-recorded conversation obtained by state officials in violation of Illinois law admissible in federal court). Other circuits, moreover, have adopted this position. *See, e.g., United States v. Nelligan*, 573 F.2d 251 (5th Cir.1978); *United States v.*

*Shaffer*, 520 F.2d 1369, 1371–72 (3d Cir. 1975) *(per curiam )*, *cert. denied*, 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976). In short, because this evidence was obtained in accordance with federal law, the district judge did not err in admitting it. As the government points out in its brief, other sanctions already exist to control the conduct of state officers. *United States v. Rickus*, 737 F.2d 360, 364 (3d Cir.1984), *cert. denied*, 474 U.S. 921, 106 S.Ct. 252, 88 L.Ed.2d 260 (1985). *See also Shaffer*, 520 F.2d at 1372.

**C.** *Outrageous Governmental Conduct*

Daniel D'Antoni appeals the district court's denial of his motion for a new trial based on an argument of outrageous governmental conduct. We agree that the district court was correct in denying this motion.

D'Antoni argues that the government's conduct was outrageous for several reasons. First, he maintains that it was outrageous because of the phone calls of Ferguson, the government informant, which were frequent and persistent in nature over a period of four days, and Ferguson's constant attempts to arrange a meeting. Dan claims that Ferguson always was the one to call him, even when Dan said he would call Ferguson back. Second, D'Antoni claims that Ferguson offered a few times to provide a murder weapon, knowing through the detective on the case that neither Dan nor his brother had a gun. Dan claims he was lying to Ferguson to stall him from killing Rebecca Reynolds. He also claims that he was avoiding Ferguson over the four-day period during which the events in this case took place, by making plans not to be at home during that time.

This court previously has noted that there is doubt as to the validity of the outrageous governmental conduct doctrine. *United States v. Bontkowski*, 865 F.2d 129, 131 (7th Cir.1989). This doctrine stems from a statement in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1978), in which the Supreme Court noted that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643; *see also Bontkowski*, 865 F.2d at 131; *United States v. Valona*, 834 F.2d 1334, 1343 (7th Cir.1987). Like the Supreme Court, this circuit also has left the possibility open, although we have never reversed a conviction on this ground. *Valona*, 834 F.2d at 1343 (quoting *United States v. Swiatek*, 819 F.2d 721, 725 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987)).

Whether the Supreme Court itself ultimately will validate the doctrine of outrageous governmental conduct seems doubtful. In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a three justice plurality opined that "[t]he remedy of the criminal defendant with respect to acts of government agents, which far from being resisted, are encouraged by him, lies solely in the defense of entrapment." *Id.* at 490, 96 S.Ct. at 1650; *see also Bontkowski*, 865 F.2d at 132; *United States v. Williams*, 858 F.2d 1218, 1225 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). As this circuit previously has observed:

[A]n examination of the post-*Hampton* cases decided by the courts of appeals indicates that due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant.

*United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983); *accord Bontkowski*, 865 F.2d at 132; *Williams*, 858 F.2d at 1225; *Valona*, 834 F.2d at 1343.

In support of his contention that the government's conduct was sufficiently outrageous, Dan D'Antoni cites *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). In *Twigg*, a case involving conviction of a defendant for the illegal manufacture of a

Schedule II controlled substance, the Third Circuit found that the governmental involvement in the criminal activities had reached "a demonstrable level of outrageousness," 588 F.2d at 380. There, the government gratuitously supplied twenty percent of the glassware and an indispensable ingredient in the drug's manufacture, made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials, arranged for the purchase of supplies through a government informant, and found a laboratory site. All of the laboratory expertise, moreover, was furnished by the government informant. *Id.* at 380–81.

We think that *Twigg* is distinguishable for several reasons, and that the government's conduct in this case does not come close to the "truly outrageous." First, this court previously has observed that the mere offer to supply contraband, or even the supplying thereof, does not in and of itself constitute outrageous governmental conduct. *Bontkowski*, 865 F.2d at 132; *Valona*, 834 F.2d at 1343; *see also Hampton*, 425 U.S. at 488–90, 96 S.Ct. at 1649–50 (upholding conviction for distribution of heroin despite defendant's contention that the heroin had been supplied by a government informer).

Thus, the very fact that the government may have supplied, or offered to supply, an agent of the crime does not in itself constitute outrageous governmental conduct. In *Russell*, the Supreme Court noted that contribution of the crucial manufacturing ingredient to a *drug manufacturing enterprise already in process* was "scarcely objectionable." 411 U.S. at 432, 93 S.Ct. at 1643. Like *Russell*, this is a case where the "criminal enterprise," the conspiracy to kill Rebecca Reynolds, already was under way. The government did not "sow the seeds of criminality" and lure the defendant into a conspiracy. *Twigg*, 588 F.2d at 380 (distinguishing cases where the government supplied materials to an ongoing conspiracy). Thus, we do not think that the government's conduct in this case in *offering* to supply a gun was outrageous. This also is true of the repeated phone calls by Ferguson to Dan. As the government points out in its brief, the very nature of the crime it was trying to prevent, the murder of a fourteen-year-old government witness, required them to maintain close contact with Todd and with the defendants. *See Valona*, 834 F.2d at 1343 ("[I]n evaluating whether government conduct is outrageous the court must consider the nature of the crime and the tools available to law enforcement officers to combat it.") (quoting *Twigg*, 588 F.2d at 378 n. 6).

### D. *Sufficiency of the Evidence to Convict Dan D'Antoni*

 As a final matter, we reject defendant Dan D'Antoni's argument that there was insufficient evidence to convict him of conspiracy to murder a government witness. The bulk of D'Antoni's argument is that the co-conspirator statements of Todd D'Antoni, which were "crucial" to establishing the conspiracy, were improperly admitted. Thus, without these statements, there was insufficient evidence to convict him. Because we already have discussed the admissibility of the co-conspirator statements, we need not repeat this discussion here. Alternatively, Dan D'Antoni argues that even if these statements were properly admitted, there still is insufficient evidence to sustain his conviction. Dan D'Antoni points to his trial testimony that he began to avoid Ferguson, did not return his calls, and repeatedly refused to have a three-way telephone call with Ferguson and Ales.

We agree with the government, however, that there was sufficient evidence to convict Dan D'Antoni. As this court noted in *United States v. Whaley*, 830 F.2d 1469, 1472–73 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988):

> Appellate review of the sufficiency of the evidence to support a criminal conviction requires this court to determine whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' ...

This appellate court will not reconsider the evidence or assess the credibility of the witnesses.... We give deference to the trial jury's weighing of the evidence and its drawing of reasonable inferences.... 'Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' ... To succeed in his challenge of the sufficiency of the evidence, therefore, the appellant has a heavy burden.... (emphasis in original and citations omitted).

As we also noted in *Whaley*, "the government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." 830 F.2d at 1473 (citations omitted).

Here, as we discussed above, the district court correctly admitted the conversations between Ferguson and Todd between September 14 and September 16, 1987. In these conversations, Todd told Ferguson that he and Dan had hired another individual to kill Rebecca Reynolds. Todd also subsequently hired Ferguson to do the killing, gave him Dan's telephone number and told him to contact Dan about the money, the gun, and obtaining a picture of Rebecca Reynolds. As the government also points out, in Dan's conversation with Ferguson on September 17, Dan told Ferguson that he had talked to Todd and that he knew everything. Dan also told Ferguson that defendant Ales was providing the photograph, and that he (Dan) would provide the weapon to kill Rebecca Reynolds. Dan also told Ferguson that he would pay him as soon as the job was done, and would provide him with cocaine in addition. As the government also points out, moreover, the jury clearly rejected Dan's version of the events, discussed above, in which he claims that he was in fact stalling Ferguson and lying to him in order to protect his brother. As noted above, it is not for us to disturb the jury's determination of credibility. Hence, we hold that there was suffi-cient evidence to convict Dan D'Antoni of conspiracy to kill a government witness.

## III. Conclusion

For the reasons discussed above, we AFFIRM the judgment of the district court.

POSNER, Circuit Judge, concurring.

I join Judge Kanne's opinion unreservedly. My remarks are confined to a statutory problem that this case discloses but only Congress can solve: the five-year maximum penalty in 18 U.S.C. § 371, the federal conspiracy statute. The defendants in this case were found guilty of conspiring to murder a child because she was a potential government witness in the prosecution of a brother of one of them for federal narcotics violations that had resulted in the death of another child. The judge sentenced each of the defendants to the maximum term of five years.

The proper punishment for conspiracy is a function of the gravity of the crime the defendants conspired to commit. This point, acknowledged both in the new sentencing guidelines, see U.S. Sentencing Comm'n, Guidelines Manual § 2X1.1 (Jan. 15, 1988), and in the second paragraph of section 371, which caps the punishment for conspiracy to commit a misdemeanor at the maximum punishment for the misdemeanor, shows that a five-year ceiling for *all* conspiracies to violate a federal felony statute makes no sense. The federal criminal code contains a number of special conspiracy provisions with suitably severe penalties. Examples include 18 U.S.C. § 351, which authorizes a maximum term of life imprisonment for conspiring (unsuccessfully) to kill or kidnap high federal officials; 18 U.S.C. § 241, which imposes a maximum term of ten years for conspiring to deprive a person of his civil rights—and life imprisonment if the victim dies; 18 U.S.C. § 286, which authorizes a maximum of ten years for conspiring to defraud the government; 18 U.S.C. § 2271, which authorizes a maximum of ten years for conspiring to destroy vessels; 18 U.S.C. § 2384, which authorizes a maximum of twenty years for seditious

conspiracy; and, of particular pertinence here, 21 U.S.C. § 846, which authorizes a maximum sentence for conspiring or attempting to violate the federal drug laws equal to the maximum sentence for the completed violation. But the federal witness-tampering statute, 18 U.S.C. § 1512, while providing heavy penalties for killing, attempting to kill, or otherwise interfering with a witness, does not contain a conspiracy provision, so that the prosecution in this case had to proceed under section 371, with its five-year maximum. There is no reason for such a low ceiling; it just contributes to the randomness of federal criminal punishment. The same day we heard argument in this case we heard argument in a case where the defendant had received a fifty-year sentence for a relatively minor drug offense. Were it not for the ceiling in section 371, the punishment range for conspiring to kill a witness in violation of section 1512 would be 24 to 30 years for a first offender. See Guidelines Manual, *supra*, §§ 2J1.2(a), (b)(1), 2X1.1(b)(2).

Congress should revise section 371 so that its maximum penalty depends on the crime the defendants conspired to commit. (At the same time it might wish to address another striking deficiency in the federal criminal code—the absence of a general attempt statute.) One way to do this would be to make the maximum penalty for the conspiracy equal to the maximum for the underlying crime, with perhaps a cap of twenty years when the underlying crime is punishable by a longer sentence, provided the conspiracy fails. There is an argument for punishing *successful* conspiracies *more* severely than crimes committed without conspiracy, on the ground that a conspiracy is more dangerous than an individual criminal. The sentencing guidelines do not do this but they do provide that the conspiracy should be punished as severely as the completed crime if "the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interrup-

tion by some similar event beyond their control," § 2X1.1(b)(2).

With the qualification just noted, the sentencing guidelines proportion the punishment for conspiracy to the punishment for the underlying crime. This is also the approach of 18 U.S.C. § 373, which sets the maximum punishment for soliciting commission of a crime of violence at one-half the maximum punishment for the crime. Why the defendants in this case were not charged under section 373—or under 18 U.S.C. § 1512(a)(2)(A), which punishes attempting to kill a witness, see *United States v. Rovetuso*, 768 F.2d 809, 821–23 (7th Cir.1985), a factually similar case—is a puzzle.

The precise method of implementing the reform is not important. The principle that criminal sentences should be related to the gravity of the criminal conduct is, and deserves Congress's attention. Inadequate punishment can work a miscarriage of justice, just as excessive punishment can.