UNITED STATES of America,
Plaintiff–Appellee,

v.

Curtis MILLER, Defendant–Appellant.

No. 89–1615.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1989.

Decided Dec. 18, 1989.

K. Tate Chambers, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Peoria, Ill., for plaintiff-appellee.

Michael E. Brandt (argued), Peoria, Ill., for defendant-appellant.

Before CUMMINGS, CUDAHY and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Curtis Miller was charged and convicted in a bench trial on one count of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. section 841(a)(1) and two counts of distributing cocaine in violation of 21 U.S.C. section 841(a)(1) and 18 U.S.C. section 2. He now challenges his conviction and sentence on three grounds. First, Miller argues that the government engaged in "outrageous conduct" by employing a drug addict with whom Miller was romantically involved to induce him to sell drugs. Second, Miller asserts that the district judge relied on insufficient evidence to support a Federal Sentencing Guidelines base offense level of 18. Finally, Miller urges us to find that the district court erred in refusing to grant him a two-level reduction in his base offense level for minor participation in the drug transactions. We affirm the judgment of the district court on each of these claims.

## I.

Miller was arrested in August 1988 in Knox County, Illinois, after making two sales of cocaine to Agent Randy Squire of the Multi–County Narcotic Enforcement Group ("MEG"). The first sale occurred on March 18, 1988, when Squire purchased 3.5 grams of cocaine from Miller for $275. On April 4, 1988, Miller sold Squire another 6.9 grams for $500. While they were discussing the arrangements for the March 18 deal, Miller told Agent Squire that his source required the money for the drugs up front; Miller said everyone was doing it that way and showed Squire his wallet full of cash. Agent Squire testified that during the April 4 transaction, he asked Miller about buying a full ounce (approximately 28 grams) of cocaine; Miller replied that he could procure up to an ounce, with three days notice, because his Florida source "saved" him an ounce every time he visited

town. At their first meeting prior to the March 18 buy, Miller had informed Agent Squire that his source flew into Galesburg about every three weeks.[1] Two to three weeks after the April 4 transaction, Squire and Miller met again to discuss the ounce purchase. That deal was never consummated because, according to Agent Squire, MEG was unwilling to provide the $1400 up-front money that Miller requested, given the fact that the cocaine would not be delivered until ten days later. Squire had no further communication with Miller.

Squire was introduced to Miller by Linda Zefo (a.k.a. "Lin Ford"), who was also present at the March 18 and April 4 transactions. Zefo first met Miller on New Year's Eve of 1987 and became intimate with him soon after. They had dated for one and a half to two weeks in January 1988 before their relationship ended. In February 1988, Zefo became a confidential informant for MEG. MEG paid her living expenses while it employed her, and she also received $60 for each drug transaction that she arranged for MEG. At trial, Zefo admitted to being a cocaine addict both before and during her employment with MEG. Agent Squire and Special Agent Dan Bates knew of Zefo's drug habit, discouraged her from using cocaine, placed her in a drug treatment program and ultimately discontinued her employment when she failed to abandon her drug habit. Both agents testified that they had never personally witnessed her using drugs. On the two occasions when Agent Squire purchased cocaine from Miller, Zefo never had possession of those drugs outside of Squire's presence, and each time she immediately handed the cocaine to Squire. In addition to testifying about the two MEG buys, Zefo also told the court that Miller supplied her with small amounts of cocaine (quarter, half and single grams) and that he would sometimes visit her apartment late at night, saying he had been selling similar amounts in local bars. While Miller occasionally spent the night at Zefo's apartment during the MEG investigation, both

---

1. Miller withheld the name of his source until he declared at the sentencing hearing following his conviction that the source was his roommate, Tim Palmer. Palmer denied this accusation, and no other evidence supported Miller's eleventh-hour confession.

he and she testified that they did not resume a sexual relationship.

The trial testimony also established a link between Miller's roommate, Tim Palmer, and cocaine. Linda Zefo stated that she met Miller through Palmer, with whom she had been friends for fifteen years and from whom she had frequently procured cocaine. When she began working for MEG, she telephoned Palmer to try to set up a buy, but Palmer said he was no longer dealing and she should speak to Miller. She did speak to Miller several times, finally arranging the March 18 transaction. Palmer, who testified under an oral grant of immunity at Miller's sentencing hearing, stated that in the two years that the men had lived together he had never seen Miller with quantities larger than quarter, half and single gram amounts.

Having heard all the evidence, the district judge found Miller guilty on all three counts. Miller filed a post-trial motion for a new trial, claiming that the government's use of Zefo, Miller's former girlfriend and a known drug abuser, as an informant against him constituted "outrageous conduct." The district court denied the motion and imposed concurrent prison terms of 32 months for each of the counts. Miller appeals from these rulings.

## II.

■ Miller urges us to conclude that the government's employment of Linda Zefo as a paid informant constituted "outrageous conduct" in violation of the due process clause. The Supreme Court introduced the concept of outrageous governmental conduct and distinguished it from the defense of entrapment in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In that case, the Court found neither entrapment nor outrageous govern-

ment conduct, but it left open the possibility that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." *Id.* at 431–32, 93 S.Ct. at 1643.

In order to preclude prosecution, the government's conduct must "violat[e] that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. at 1643 (citing *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303–04, 4 L.Ed.2d 268 (1960)). Following *Russell,* this circuit has declared that "government conduct must be truly outrageous before due process will prevent conviction of the defendant." *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.1983).[2] While several criminal appellants have charged the government with outrageous conduct in their cases, this court has yet to overturn a conviction on that basis. *See United States v. Valona,* 834 F.2d 1334 (7th Cir. 1987); *United States v. Shoffner,* 826 F.2d 619 (7th Cir.), *cert. denied sub nom. Stange v. United States,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987); *United States v. Swiatek,* 819 F.2d 721 (7th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987); *United States v. Bruun,* 809 F.2d 397 (7th Cir.1987); *United States v. Podolsky,* 798 F.2d 177 (7th Cir. 1986); *United States v. Belzer,* 743 F.2d 1213 (7th Cir.1984), *cert. denied sub nom. Clements v. United States,* 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985); *United States v. Thoma,* 726 F.2d 1191 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). Like those before him, Miller has failed to demonstrate that the government's conduct lead-

---

**2.** A panel of this court recently questioned the validity of the *Russell* dictum on outrageous government conduct because a three-justice plurality in *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976), suggested that the remedy of a criminal defendant who actively participates with government agents in the commission of a crime is limited to the entrapment defense. *See United States v.*

*Bontkowski,* 865 F.2d 129, 131–32 (7th Cir.1989); *see also United States v. Williams,* 858 F.2d 1218, 1225 (7th Cir.1988), *cert. denied sub nom. Froschauer v. United States,* —— U.S. ——, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989) (pointing to same language in *Hampton* ). At this point, however, the doctrine of outrageous government conduct has not been expressly disavowed by the Supreme Court or by this circuit.

ing to his arrest and indictment was sufficiently outrageous to preclude his prosecution and conviction.

Miller attempts to convince us otherwise by pointing to MEG's contingent fee arrangement with Linda Zefo, her continued use of cocaine while in MEG's employ and her sexual relationship with Miller. Neither separately nor combined, however, do these facts amount here to "truly outrageous" government conduct. This court has concluded that contingent fee payments to government informants are not *per se* outrageous; rather, the jury may consider such arrangements as evidence relating to the informant's credibility. *Valona*, 834 F.2d at 1344 (government recruited and transported informant into state and agreed to pay him 10% of value of any contraband, fruits or instrumentalities of criminal activity recovered with his assistance).

Nor do we consider outrageous *per se* the government's employment of former drug users and dealers as informants in undercover narcotics investigations. The use of such persons, while perhaps unfortunate and certainly unappealing, does contribute to undercover agents' ability to penetrate criminal associations and root out crime at its source. *See Kaminski*, 703 F.2d at 1007, 1010 (use of "unsavory" characters in undercover police investigations is "an unattractive business, but that is the nature of the beast...."). MEG did not act improperly in hiring Linda Zefo as an informant. There is no evidence whatsoever that MEG supplied Zefo with cocaine or knowingly supported her continued use of the drug. To the contrary, Agents Squire and Bates terminated Zefo's employment when she refused to remain in the drug rehabilitation program in which they had placed her.

Neither do we find it "truly outrageous" that Linda Zefo had been sexually intimate with Miller. Both Zefo and Miller testified that their sexual relationship had ended some time in January—before Zefo began her employment as an informant for MEG. They never resumed their former intimacy, and MEG apparently did not even know about their prior relationship during Zefo's employment. Even if Agents Squire and Bates had known of the relationship, there is no suggestion that they ever encouraged Zefo to use sex as a weapon in their investigation of Miller's drug activities. We also note that in *Shoffner*, this court upheld a conviction where the government's key informant and witness in an auto theft conspiracy case had familial and sexual relationships with several of the defendants. *See also United States v. Fadel*, 844 F.2d 1425 (10th Cir.1988) (finding no outrageous government conduct where confidential informant in cocaine conspiracy case had sexual relationship with defendant while in government's employ and repeatedly asked defendant for cocaine to sell); *United States v. Simpson*, 813 F.2d 1462 (9th Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987) (FBI's employment of informant known to be prostitute, heroin user and fugitive from Canadian drug charges was not outrageous, despite informant's sexual intimacy with defendant heroin dealer). Given these decisions and the facts of this case, we are dubious whether MEG's behavior was improper, let alone "truly outrageous."

Most importantly, Miller has failed to refute the government's substantial evidence of his predisposition to distribute cocaine. The government was minimally involved in Miller's criminal activity; its informant introduced Miller to Agent Squire and set up two drug sales. The Constitution does not bar prosecution when the government or its employees "merely afford opportunities or facilities for the commission of the offense...." *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644 (citing *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932), and *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820–21, 2 L.Ed.2d 848 (1958)). Further, this court has concluded that "[t]he use of informants and the offer of a reasonable inducement are proper means of investigating crimes." *Kaminski*, 703 F.2d at 1009. With these guidelines in mind, we reject, as did the court below, Miller's contention that Zefo "manufactured" the crimes of which he was con-

victed. She did no more than ask him to supply her with drugs, as he had apparently done quite willingly before, according to her testimony and as attested by Miller's request in Agent Squire's presence that Zefo repay him a $25 drug debt.[3] In this case, sufficient credible evidence established that Miller expressed no reluctance to procure the amounts of cocaine he eventually sold to Agent Squire and that he hesitated only long enough to acquire the necessary supply of drugs from his source.[4] Miller's wallet bulging with currency, which he voluntarily showed to Squire at their first meeting, supplied further evidence of Miller's predisposition to sell cocaine. Certainly, the government had no involvement at all in the continuing conspiracy between Miller and his source to distribute cocaine. Miller's own admission to Agent Squire and Linda Zefo revealed the existence of that conspiracy to the government.

It is irrelevant that MEG did not begin an investigation of Miller until informed by Linda Zefo of his drug-related activities. The Constitution does not require the government to have a preexisting good faith basis for suspecting criminal activity before initiating an undercover investigation, *Thoma,* 726 at F.2d 1198–99, nor does any law command the police to focus their investigative efforts only on "big dealers," as Miller's brief implies. In any event, MEG did have a good faith basis for investigating Miller once informed by Zefo that Miller was selling cocaine. By dealing drugs, Miller took the risk that one of his clients would report his activities to the police. We are unmoved by the fact that it was his former girlfriend who squealed.

### III.

Miller challenges the district court's application of the Federal Sentencing Guidelines to his case. Specifically, he asserts that the court lacked sufficient evidence from which to determine the amount of cocaine associated with the conspiracy conviction. Therefore, Miller urges, the appropriate sentence should have been based on the total amount of cocaine involved in the two distribution counts—10.1 grams. As an initial matter, we note that we review the district court's findings of fact at a sentencing hearing only for clear error. *United States v. Agyemang,* 876 F.2d 1264, 1271 (7th Cir.1989). This rule of appellate review is especially important where, as here, the district court has had an opportunity to observe witnesses first-hand and judge their credibility. After considering Miller's challenge to the district court's stated reasons for imposing its sentence, we cannot say that the district court's findings of fact were clearly erroneous, or that the district court erred as a matter of law in applying the Guidelines to Miller's case.

At Miller's sentencing hearing, the district court listened to further testimony from Miller and his former roommate, Tim Palmer. However, the court based its calculation of the amount of cocaine involved in the conspiracy charge on Miller's own admission to Agent Squire that he received approximately one ounce of cocaine every three weeks from his source. The court found that the conspiracy lasted from January 1, 1988—the day Linda Zefo met Miller—until April 4, 1988. The court chose April 4 (the day of the second buy) as the concluding date because it found insuffi-

---

**3.** Miller makes much of Tim Palmer's testimony during the sentencing hearing that Linda Zefo was "bugging" Miller to obtain cocaine for her. However, it was Miller's own defense counsel who supplied the word "bugging" in his cross-examination of Palmer. Palmer actually testified that Zefo "kept asking" Miller to obtain cocaine for her. Record at 31, p. 58. In our view, such requests, even though repeated, were not an unreasonable inducement "shocking to the universal sense of justice." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643.

**4.** We have previously intimated that a court may recognize a defense of outrageous government conduct even where the defendant was predisposed to commit a crime if, for example, the government's agents or employees were to make a credible threat of physical violence to a defendant or a defendant's family. *See Belzer,* 743 F.2d at 1217 & n. 3. But no such extreme circumstances are present in this case.

cient evidence to indicate the continuing existence of the conspiracy after that date. Record at 31, pp. 61–62, 63.[5] The court calculated that Miller had received a total of 122.85 grams during the thirteen weeks between January 1 and April 4.

The district court proceeded reasonably, and its findings are not clearly erroneous. Despite the changes that the Guidelines have imposed on the sentencing process, it remains our rule that "so long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy, the information may properly be taken into account in passing sentence." *United States v. Marshall*, 519 F.Supp. 751, 754 (D.Wis.1981), *aff'd*, 719 F.2d 887 (7th Cir.1983); *see also* Sentencing Guidelines § 6A1.3 (adopting *Marshall* rule). The district court in this case found that Agent Squire's testimony concerning Miller's admission, together with other credible evidence, supported a finding beyond a reasonable doubt of Miller's involvement in a conspiracy to distribute cocaine. Consequently, the district court was unquestionably permitted to consider that same evidence in determining Miller's base sentencing level. Miller essentially complains that the district court credited the testimony of Agent Squire and disregarded the conflicting testimony given by him and his roommate, Tim Palmer. Inasmuch as Miller and Palmer disagreed with each other, and given the trial court's superior capacity to assess the credibility of the witnesses, we will not overturn the district court's findings of fact on this matter.

## IV.

We are also asked to review the district court's application of the Sentencing Guide-lines to the facts in this case. Again, we see no reason to disturb the decision below.

Consulting section 2D1.1(c) of the Guidelines, the court determined that Miller's appropriate base offense level was 18. Because Miller had no prior convictions, the court assigned him a criminal history category of I. Thus, the prescribed sentencing range was 27–33 months imprisonment, and the district court set Miller's sentence at a concurrent term of 32 months on each count. Record at 32, p. 110.

The court refused a two-level reduction for Miller's allegedly minor role in the conspiracy. Miller claims that this refusal constituted error.[6] We have recently held that we lack appellate jurisdiction to review a district court's refusal to depart from the prescribed sentencing range. *United States v. Franz*, 886 F.2d 973 (7th Cir. 1989). Miller, however, essentially argues that his sentence resulted from an incorrect application of the Guidelines. We therefore have jurisdiction over this appeal pursuant to 18 U.S.C. section 3742(a).

Miller relies on section 3B1.2(b) of the Guidelines, which instructs the sentencing judge to decrease the base offense level by two if the defendant was a minor participant in any criminal activity. The commentary to that section, however, observes that the decision whether to apply this reduction "involves a determination that is heavily dependent upon the facts of the particular case." United States Sentencing Commission, *Guidelines Manual* § 3B1.2 (Nov. 1989). Because of the critical importance of factual findings to a district court's decision whether to allow a two-level reduction under this section, the standard of review

---

**5.** We have had unnecessary difficulty in discovering the district court's reasons for imposing Miller's sentence. While the district court did complete a computerized form entitled "Report of Statement of Reasons for Imposing Sentence," Record at 28, that document merely indicates that the court adopted the findings of the presentence report, but it does not state precisely what those findings were. We reiterate the requirement, recently established in *United States v. White*, 888 F.2d 490, 495–96 (7th Cir. 1989), that counsel provide this court with the district judge's specific findings of fact relevant

to sentencing, and we ask district courts, for their part, to attempt to consolidate their specific findings into some readily accessible form.

**6.** The court also rejected Miller's request for a two-level reduction for acceptance of responsibility, finding that Miller had attempted throughout the trial and sentencing hearing to shift the blame for his actions to other people. Record at 31, pp. 38–39. Miller does not challenge that decision here.

for such a decision must be clear error. *See United States v. Buenrostro*, 868 F.2d 135, 138 (5th Cir.1989), *reh'g denied*, 873 F.2d 297 (whether defendant was "minor" or "minimal" participant in crime under section 3B1.2 is factual finding); *cf. United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989) (whether defendant was "organizer" within meaning of section 3B1.1(c) was question of fact). Miller was involved in a conspiracy to possess with intent to distribute cocaine over a period of at least four months. The district court calculated that during that time Miller received over 100 grams of cocaine, which he then sold. The fact that his unidentified co-conspirator may have been "more guilty" than he does not inevitably lead to a conclusion that Miller was, therefore, only a minor participant in the crime. Applying the proper standard of review and giving due deference to the district court's application of the Guidelines to Miller, as we must under 18 U.S.C. section 3742(e), we do not find clear error in the court's refusal to grant Miller a two-level reduction for minor participation.

The judgment of the district court is AFFIRMED.

EASTERBROOK, Circuit Judge, concurring.

I join the court's opinion, which observes that Miller loses no matter the state of the "outrageous governmental conduct" defense. Our court has never reversed a conviction on the basis of this defense and has questioned language looking favorably on it. E.g., *United States v. Bontkowski*, 865 F.2d 129, 131–32 (7th Cir.1989); *United States v. Podolsky*, 798 F.2d 177, 181 (7th Cir.1986). When push comes to shove, we should reject the contention that the criminal must go free because the constable was too zealous. Why raise false hopes? Why waste litigants' and judges' time searching for and rejecting on the facts defenses that ought not exist as a matter of law? Everyone has better things to do. Cf. *United States v. Wesson*, 889 F.2d 134, 135 (7th Cir.1989).

Justice Rehnquist's opinion in *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976), supplies adequate reasons not to recognize a "due process" defense. Any claim to reversal of the conviction must rest on the proposition that the government's "outrageous" conduct violated a right *of the defendant*—a personal right secured by the Constitution rather than invented for the occasion. The entrapment defense reflects a conclusion that the statute does not punish conduct that the government has induced the defendant to commit by breaking down his resistance. *Sorrels v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). The "due process defense" does not rest on a claim that the prosecutor seeks to exceed the reach of the statute; it supposes that the defendant committed the crime defined by law. It is more like a claim that the government is violating the community's moral standards.

Defendants who think that the government went "too far" may make an entrapment defense or say that they lack the *mens rea* required of the offense. Miller had the necessary *mens rea*, however, and predisposition was established by earlier sales. So the traditional defenses were unavailable. As he committed the crime, he should stand convicted. If the investigators were too creative or squandered their limited resources, this is a political problem. Congress can hold oversight hearings or pass a law; we shouldn't apply a chancellor's foot veto. Dissipating law enforcement resources injures persons who become victims of crime when the deterrent force of the law declines. Reversing convictions of the guilty cannot apply balm to these wounds. Those who protest that social interests would have been served by prosecuting someone else (or some additional, similarly situated persons) routinely lose. E.g., *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *FTC v. Universal–Rundle Corp.*, 387 U.S. 244, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967). We deem it enough to support punishment that this person committed this

offense, leaving to other institutions the redirection of investigative or prosecutorial resources. Cf. *McCleskey v. Kemp,* 481 U.S. 279, 306–12, 107 S.Ct. 1756, 1774–77, 95 L.Ed.2d 262 (1987); *Falls v. Town of Dyer,* 875 F.2d 146 (7th Cir.1989). So it should be here.

Justice Rehnquist's opinion in *Hampton* did not speak for a majority of the Court, and some have read Justice Powell's concurring opinion, 425 U.S. at 492–95, 96 S.Ct. at 1651–53, as adopting an "outrageousness" defense. Put this together with the dissenting Justices in *Hampton* and you have five. If Justice Powell opened that door in *Hampton,* he shut it in *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), writing for a majority of six. Investigators hired a women to cultivate "friendship" with a bank's courier. The courier paid a visit to the woman's apartment; after a time they went to dinner. While they were gone, the agents rifled his briefcase and found documents incriminating the bank's customers, who were prosecuted. They could not challenge the search under the fourth amendment because they did not have privacy interests in the briefcase. So they contended that the use of the evidence, gathered by "wilfully lawless activities", 447 U.S. at 734, 100 S.Ct. at 2445, should be suppressed under the Due Process Clause and the court's supervisory power. The Court declined the invitation, reasoning that the rules developed under the fourth amendment fully reflected the interests of society and suspects, and that replacing these rules with ill-defined supervisory or due process standards would undermine a balance properly struck. 447 U.S. at 733–37, 100 S.Ct. at 2445–47. And there was another problem:

> [E]ven if we assume that the unlawful briefcase search was so outrageous as to offend fundamental "canons of decency and fairness," the fact remains that "[t]he limitations of the Due Process Clause ... come into play only when the Government activity in question violates some protected right of the *defendant,*" *Hampton v. United States, supra,* 425

U.S. at 490, 96 S.Ct. at 1650 (plurality opinion).

447 U.S. at 737 n. 9, 100 S.Ct. at 2447 n. 9 (emphasis and ellipsis by the Court; citations and internal quotes omitted). This footnote quotes from and adopts the core of Justice Rehnquist's assessment in *Hampton.*

Developments in other parts of the law since *Payner* reinforce its message that appeals to "fairness" are not satisfactory substitutes for legal rules. Take for example *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which held that some evidence could be used even though obtained in violation of the defendant's fourth amendment rights. Although some cases had justified the exclusionary rule on the ground that judges should not sully their hands with evidence got at unlawfully, the Court concluded that exclusion of probative evidence serves instrumental rather than moral ends, a difference with substantial consequences for the rule's scope. 468 U.S. at 907–08, 104 S.Ct. at 3412–13. Or consider *Graham v. Connor,* —— U.S. ——, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), eliminating substantive due process as the basis of damages awards for excessive force in arrests, on the ground that legal rules should follow the constitutional provisions directly applicable—in *Graham* the fourth amendment. See also *Gumz v. Morrissette,* 772 F.2d 1395, 1404–09 (7th Cir.1985) (concurring opinion). Many more cases could be mined from the same vein.

"Outrageousness" as a defense does more than stretch the bounds of due process. It also creates serious problems of consistency. The circuits that recognize a "due process defense" can't agree on what it means. How much is "too much"? The nature of the question exposes it as (a) unanswerable, and (b) political. What, if anything, could separate stirring up of crime in unpalatable ways here from the Operation Greylord methods sustained in *United States v. Murphy,* 768 F.2d 1518, 1528–29 (7th Cir.1985)? From the "creative" endeavors in Abscam? *United States v. Jannotti,* 673 F.2d 578 (3d Cir. 1982) (en banc). From any of the "sting"

operations? From the rest of the sordid drug business, so dependent on caitiff assistants? Any line we draw would be unprincipled and therefore not judicial in nature. More likely there would be no line; judges would vote their lower intestines. Such a meandering, personal approach is the antithesis of justice under law, and we ought not indulge it. Inability to describe in general terms just what makes tactics too outrageous to tolerate suggests that there is no definition—and "I know it when I see it" is not a rule of any kind, let alone a command of the Due Process Clause.

The kinds of prosecutions that trouble me most are not those like Operation Greylord or offers of sex in exchange for cocaine, but those that impose costs on the innocent. Take for example a sting in which the FBI sets up a fence and buys stolen goods. The money the government pumps into the business must lead people to steal things to sell to the FBI—with misery for the victims of the burglary and potential violence in the process. Stings have been upheld consistently, however, and we have concluded that the innocent victims cannot recover damages from the government. *Powers v. Lightner*, 820 F.2d 818 (7th Cir.1987). Methods such as those used to ensnare Miller do not injure bystanders and so do not trouble me. Other judges are offended by immorality (such as sponsoring an informant's use of sexual favors as currency) or by acts that endanger informants (such as supplying them with drugs for personal use) but not by a traditional sting. This shows the subjective basis of the concern—all the more reason not to have such a doctrine in our law.