**UNITED STATES of America, Plaintiff,**

v.

**Norman JACOBS and Rex Rasmussen, Defendants.**

**No. 84 CR 491.**

United States District Court, N.D. Illinois, E.D.

Aug. 29, 1990.

734

Mitchell Mars, U.S. Atty's Office, Chicago, Ill., for plaintiff.

Jayne Carr Thompson, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Each of the two defendants in this case, Norman Jacobs ("Jacobs") and Rex Rasmussen ("Rasmussen"), has filed a motion to dismiss the indictment against him on grounds of outrageous government misconduct and pre-indictment delay. For the reasons set forth below, at this time, the Court denies the motions of both defendants without an evidentiary hearing.

### I. *Facts*

In an eight-count indictment, the Government has charged Jacobs and Rasmussen with violations of certain federal narcotics laws. These charges arose from a lengthy undercover operation conducted by the Federal Bureau of Investigation (FBI) with the cooperation of an informant named Todd Darling ("Darling").

Prior to his cooperation with the Government, Darling worked for an illegal bookmaker, accepting wagers over the tele-

phone on horses and sports. Because he was an employee of the operation, Darling himself could not place wagers with the bookmaker and, therefore, enlisted a friend to do so. Together, they lost in excess of $14,000.00 on these wagers.

Because Darling could not afford to pay this gambling debt, on or about March of 1983, he contacted Jacobs for assistance in arranging a $10,000.00 "juice" loan. Jacobs and Darling became acquainted during the course of Jacobs' heavy gambling days during the 1970s and early 1980s. During this same period, Jacobs, through his gambling activities, also became acquainted with Rasmussen and other gamblers who traded information about sporting events and the various odds being offered by illegal bookmakers.

After being contacted by Darling, Jacobs introduced Darling to a loan shark named "Ben."[1] Ben indicated that he would provide a $10,000.00 "juice" loan to Darling at an interest rate of five percent per week,[2] but only if Jacobs agreed to guarantee the loan. Jacobs agreed to do so, and on April 1, 1983, Jacobs gave Darling a $5,000.00 installment at Jacobs' dental office. On the following day, Darling received the balance of the loan from Jacobs. Although Darling made the first couple of weekly interest payments to Jacobs, he thereafter defaulted.

In May of 1983, Darling approached the Government and offered to cooperate with federal agents concerning the "juice" loan arranged by Jacobs and unrelated bookmaking activities. Pursuant to this investigation, on or about May 9, 1983, Darling, under the supervision of federal agents, began to covertly record numerous conversations with Jacobs and Ben related to the loan transaction. For approximately the following year, the focus of the Government's investigation and the topic of the recorded conversations were the usurious "juice" loan.

Meanwhile, because Darling had ceased making the weekly interest payments on the "juice" loan to Jacobs, Ben looked to Jacobs for repayment. Fearing the consequences that might result from his failure to make good on his guaranty to Ben and his underworld sources, Jacobs continued to make the weekly interest payments on the "juice" loan to Ben.

In May of 1984, the focus of the Government's investigation shifted from the usurious "juice" loan arranged by Jacobs and bookmaking to narcotics. The parties disagree as to who introduced the subject of narcotics.

## A. The Government's Version

According to the Government, in May of 1984, Jacobs telephoned Darling regarding the loan. When Jacobs placed this call, Darling had ceased his undercover contact with Jacobs, so Darling advised the FBI of the call. At the direction of the FBI, Darling subsequently attempted to arrange a meeting with "Buck," another of Jacobs' underworld loan sources, on the pretext of making payments on the loan to Buck directly. To that end, on May 16, 1984, Darling placed a telephone call to Jacobs at his office. This call was placed by Darling from the FBI's office and, therefore, was recorded. During this conversation, Jacobs put Buck on the telephone and Buck told Darling that he now owed $31,000.00 in principal and interest on the "juice" loan. In addition, Buck instructed Darling to set up a meeting with Jacobs when Darling had the money to repay the loan.

When Darling returned home later that day, he received an unexpected telephone

---

1. In its briefs, the Government states that Jacobs introduced Darling to a loan shark named "Ben." Defendants, however, refer to the loan shark as "Buck," and a review of the transcripts reveals that while Jacobs initially dealt with a loan shark named "Ben," he later dealt with a loan shark named "Buck." In any event, whether "Ben" and "Buck" are the same person, or whether Darling was introduced to two different persons in connection with procurement of the "juice" loan makes no difference to our analysis of defendants' claims.

2. According to the Government, Jacobs subsequently told Darling that the interest was increased to seven and one-half percent per week, and Darling later ascertained that Jacobs had received $15,000.00 from the loan shark and had kept $5,000.00 for himself.

call from Jacobs. This call was not recorded because the FBI had not yet supplied Darling with the necessary recording equipment at home. During this unrecorded conversation, Jacobs introduced the subject of narcotics. According to the Government, Jacobs informed Darling that he wanted the entire $31,000.00. Jacobs also suggested to Darling that if he could obtain narcotics, Jacobs knew individuals who could dispose of narcotics and Jacobs could "put together a deal." The proceeds of the sale of narcotics could then be used to satisfy the outstanding "juice" loan. Jacobs also indicated that he did not wish to discuss the matter further over the telephone and instructed Darling to meet him at a later date.

After receiving this telephone call at home from Jacobs, Darling immediately advised the FBI. According to the Government, this unexpected development in the investigation caused it to shift its focus from the usurious "juice" loan and bookmaking activities to narcotics. Consequently, the Government instructed Darling to advise Jacobs that Darling could obtain narcotics in order to determine whether Jacobs could or would produce a buyer for them, as suggested during the previous, unrecorded telephone conversation.

On May 23, 1984, Darling met with Jacobs for breakfast and recorded their meeting. During this meeting, Darling told Jacobs that Darling had 20 ounces of cocaine. Jacobs indicated that he had a possible purchaser for the cocaine and that he would call him that day. Jacobs did, in fact, attempt to reach this as yet unnamed possible purchaser during the meeting. Over the next several days, Jacobs and Darling had several telephone conversations pertaining to this potential purchase.

On May 30, 1984, Darling received a telephone call from Rasmussen. During this conversation, which was the first recorded conversation between Darling and Rasmussen, Rasmussen introduced himself to Darling as a friend of Jacobs. Rasmussen then mentioned that Jacobs said Darling "had something." Darling and Rasmussen also discussed price and purity. On the following day, Jacobs telephoned Darling and confirmed that he had asked Rasmussen to contact Darling and that Jacobs had discussed the issue of price with Rasmussen prior to Rasmussen's call to Darling.

Over the course of the next several weeks, Darling recorded numerous conversations involving himself, Jacobs, and Rasmussen. During these conversations, Darling, Jacobs, and Rasmussen negotiated the sales price of the cocaine, the quantity available for sale, the availability of a sample for testing, and the manner in which Darling and his cocaine source, undercover agent Raymond Spoon from the FBI, would deliver the cocaine. Jacobs also volunteered the use of his dental office to consummate the deal.

Finally, on June 20, 1984, Darling and Spoon met with Jacobs at a restaurant near Jacobs' office. Rasmussen was nearby to receive the cocaine from Jacobs once Darling and Spoon delivered it to Jacobs. According to the recorded conversations which preceded this meeting, the plan was for Darling and Spoon to deliver the cocaine to Jacobs and for Jacobs to take the cocaine to Rasmussen so that Rasmussen could test a portion of it. Pursuant to this plan, Spoon delivered a package containing 20 ounces of cocaine to Jacobs and he accepted it. When Jacobs proceeded to leave the restaurant with the cocaine, he was arrested. After Jacobs' arrest, Rasmussen was seen leaving the area. Jacobs and Rasmussen were subsequently indicted for the instant narcotics offenses.

### B. Defendants' Version

According to Jacobs and Rasmussen, it was Darling who introduced the topic of narcotics at the recorded breakfast meeting between Darling and Jacobs on May 23, 1984. Although Jacobs admittedly did tell Darling at that meeting that Jacobs knew someone who had asked him for narcotics before, and Jacobs later contacted this person, who turned out to be Rasmussen, he did so only "[u]nder the informant's continued pressure."

Over the course of the next several weeks, despite Jacobs' obvious reluctance to involve himself with narcotics and his lack of knowledge about narcotics dealing, Darling, during numerous recorded conversations, enlisted the aid of Jacobs in disposing of the government-supplied cocaine under the guise of attempting to satisfy the "juice" loan. Finally, on June 20, 1984, in response to a telephone call from Darling, Jacobs met Darling and Spoon in the restaurant in Jacobs' office building. At the conclusion of this meeting, Jacobs left the restaurant carrying a bag containing 20 ounces of cocaine supplied by the Government and was immediately arrested.

After Jacobs' arrest on June 20, 1984, the Government filed a two-count criminal complaint against Jacobs. On June 25, 1984, the Government moved to dismiss the complaint without prejudice, providing no explanation for the dismissal other than the Government's desire to avoid problems with the Speedy Trial Act. Although Rasmussen apparently was neither arrested nor charged at this time, approximately eight weeks later, government agents questioned Rasmussen regarding his knowledge of Jacobs' narcotics activities. According to Rasmussen, during this questioning, government agents led Rasmussen to believe that the focus of their investigation was limited to Jacobs.

Approximately five years after these events occurred, the grand jury returned the instant indictment against Jacobs and Rasmussen, charging them with violations of federal narcotics laws. Jacobs and Rasmussen have now moved to dismiss the indictment.

## II. *Argument*

Jacobs and Rasmussen have moved to dismiss the indictment against them on two grounds. First, they claim that the charges against them were induced by outrageous government misconduct. Second, they argue that the Government's pre-indictment delay warrants dismissal. We address each of these arguments in turn.

### A. Outrageous Government Misconduct

The doctrine of outrageous government misconduct originated in the Supreme Court's decision in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). There, the Court stated that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43. In distinguishing this doctrine from the entrapment defense, the Court noted that while the entrapment defense "focus[es] on the intent or predisposition of the defendant to commit the crime," *Russell*, 411 U.S. at 429, 93 S.Ct. at 1641, the outrageous government misconduct defense requires an objective review of the government's conduct.[3]

Following *Russell*, this circuit has recognized the possibility of a defense based upon outrageous government conduct, but has never reversed a conviction on that ground and has consistently questioned the continued vitality of the doctrine. *See United States v. Duncan*, 896 F.2d 271,

---

**3.** In his supplemental reply, Jacobs argues that the doctrine of outrageous government misconduct is not a "defense" in the traditional sense of the word. According to Jacobs, whereas a traditional defense, such as entrapment, presents factual issues for the jury to decide after a trial, the doctrine of outrageous government misconduct is a question of law to be decided prior to trial and, if applicable, it acts as a bar to judicial prosecution. Although we recognize the distinction between the two concepts, we do not believe that referring to the doctrine of outrageous government misconduct as a "defense" is necessarily a misnomer. In the final analysis, when a defendant asserts a claim of outrageous government misconduct either before or after trial, he is defending himself on the grounds that the government's outrageous misconduct induced him to commit the crime. Accordingly, like many other courts, we alternately refer to the doctrine as a defense. *See, e.g., Sababu*, 891 F.2d at 1326; *United States v. Belzer*, 743 F.2d 1213, 1217 (7th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985); *United States v. Richter*, 610 F.Supp. 480, 497–98 (N.D.Ill.1985), *aff'd sub nom. United States v. Mangovski*, 785 F.2d 312 (7th Cir.), and *aff'd sub nom. United States v. Konstantinov*, 793 F.2d 1296 (7th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986).

**738**

275 (7th Cir.1990) (collecting other cases); *United States v. Sababu,* 891 F.2d 1308, 1326 (7th Cir.1989); *United States v. Miller,* 891 F.2d 1265, 1267 n. 2 (7th Cir.1989). As the Seventh Circuit most recently noted in *Duncan:*

> Whether the Supreme Court itself ultimately will validate the doctrine of outrageous governmental conduct seems doubtful. In *Hampton v. United States,* [citation omitted], a three justice plurality opined that " '[t]he remedy of the criminal defendant with respect to the acts of governmental agents, which far from being resisted, are encouraged by him, lies solely in the defense of entrapment.' "

*Duncan,* 896 F.2d at 275 (quoting *United States v. D'Antoni,* 874 F.2d 1214, 1219 (7th Cir.1989) and *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976)). Nevertheless, neither the Supreme Court nor this circuit has expressly disavowed the doctrine of outrageous government misconduct. *Miller,* 891 F.2d at 1267 n. 2.

Although the outrageous government misconduct defense has not been expressly repudiated, this circuit has emphasized that its scope is very narrow. "[A]n examination of the post-*Hampton* cases decided by the courts of appeals indicates that due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant." *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.1983). This circuit has also confirmed that whether government conduct can be characterized as so "truly outrageous" that it runs afoul of due process is a question of law. *See United States v. Swiatek,* 819 F.2d 721, 726 (7th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). Guided by these standards, we examine Jacobs' and Rasmussen's claims of outrageous government misconduct.

### 1. *Jacobs*

■ In this case, Jacobs claims that the Government acted outrageously for two reasons. First, Jacobs contends that the Government induced him to commit the offenses charged through compulsion and duress. Essentially, Jacobs argues that Darling's failure to repay a "juice" loan made by an underworld loan shark placed his guarantor, Jacobs, under duress. According to Jacobs, faced with the Hobson's choice of reneging on his guaranty and falling victim to the underworld's unorthodox methods of enforcement, or paying off the "juice" loan through an illegal narcotics transaction, he chose the latter. By allowing Darling to place Jacobs in this predicament and to struggle in this fashion, Jacobs argues, the Government unreasonably induced Jacobs to commit the charged narcotics offenses and, therefore, acted outrageously.

In support of this duress/compulsion argument, Jacobs relies primarily on *Greene v. United States,* 454 F.2d 783 (9th Cir. 1971) and several decisions within this circuit which cite the facts of *Greene* as a recognized example of "excessively coercive" law enforcement conduct. *See, e.g., United States v. Williams,* 858 F.2d 1218, 1226 (7th Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989); *United States v. Belzer,* 743 F.2d 1213, 1217 n. 3 (7th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985); *Kaminski,* 703 F.2d at 1009.[4] In *Greene,* the court sustained the defendants' claim of outrageous government misconduct where the government agent represented himself to be a member of the "syndicate," used veiled threats of "syndicate" pressure over an extended period of time to convince the defendants to produce illegal whiskey, supplied ingredients to the defendants, and was their only customer.

While Jacobs concedes that in this case, neither Darling nor any other government agent made "veiled threats" or hints of "syndicate pressure" akin to those made in *Greene,* he relies on *Greene* for the propo-

---

4. Notably, in each of these cases, the court dis-　tinguished *Greene.*

sition that "duress introduced by an underworld loan shark, through the failure of the government's informant to repay his loan" constitutes outrageous government misconduct. We disagree.

In this case, unlike *Greene*, Darling did not represent himself to be a member of the syndicate, nor did he threaten Jacobs. The source of Jacobs' pressure or "duress" was Ben, Buck, and their underworld confederates. In agreeing to act as guarantor of Darling's "juice" loan, Jacobs voluntarily undertook the risk of such pressure or duress in the event of Darling's default. Moreover, the Government points out, and Jacobs does not dispute, that Darling defaulted on the loan *before* he agreed to cooperate with the Government. Given this fact, Jacobs risked pressure from the underworld loan sharks in the event of Darling's default before the Government ever became involved in the situation. Indeed, Jacobs essentially created the risk or "duress" of which he now complains by agreeing to arrange a "juice" loan for Darling in the first instance; he conveniently overlooks the fact that when Darling asked him to do so, he simply could have said no. Because Jacobs has presented no facts which suggest that the *Government* induced Jacobs to commit the charged offenses through compulsion or duress, we reject this argument.

■ Jacobs also complains that the Government acted outrageously because it engineered and directed the narcotics offenses from beginning to end. Specifically, Jacobs claims that the Government, through Darling, manufactured the narcotics offenses in two ways: by initiating the offenses with an individual who had no history of engaging in narcotics trafficking and by supplying "much technical know-how." We analyze each of these claims separately.

First, Jacobs claims that Darling initiated the narcotics transaction with Jacobs despite his obvious reluctance to engage in narcotics trafficking and his ignorance of it. The Government, however, vigorously denies that Darling initiated the narcotics transaction with Jacobs. To the contrary,

the Government claims that Jacobs introduced the subject of narcotics to Darling, causing the Government to shift the focus of its investigation from the "juice" loan and illegal bookmaking to narcotics.

Because we believe that the issue of initiation is a material issue of fact which is more appropriately decided after all of the evidence has been presented at trial, at this time, we are unable to conclude as a matter of law that the Government acted outrageously by introducing the subject of narcotics to Jacobs. *See Richter*, 610 F.Supp. at 498 (where the court concluded that similar material factual disputes between the Government and the defendants precluded a finding of outrageous government misconduct). Although Jacobs and Rasmussen argue that the Court should resolve this factual discrepancy by conducting a hearing prior to trial, "[a] trial court need only grant an evidentiary hearing on the issue of outrageous government conduct when the defendant has presented specific facts that are sufficient to raise a significant doubt about the propriety of the government's actions." *Swiatek*, 819 F.2d at 725.

In this case, Jacobs has failed to make such a showing. Even if Darling did propose the idea of repaying the "juice" loan by selling narcotics, we do not believe that a government agent's power of suggestion, by itself, necessarily renders the Government's conduct outrageous. This circuit has stated that "[t]he Constitution does not require the government to have a preexisting good faith basis for suspecting criminal activity before initiating an undercover investigation." *Miller*, 891 F.2d at 1269. Moreover, regardless of who introduced the subject of narcotics, once it was introduced, we find it noteworthy that Jacobs hesitated only long enough to produce Rasmussen as a buyer. In addition, he participated to some extent in the negotiation of price and method of distribution, arranged for the actual exchange of the narcotics, and even volunteered his office for the exchange. Ultimately, of course, Jacobs accepted delivery of the 20 ounces of cocaine.

As an additional basis for urging us to find that the Government engineered the entire narcotics transaction, Jacobs contends that the Government supplied much technical "know-how" to the narcotics transaction. To bolster this argument, Jacobs points to his own ignorance of narcotics trafficking and to his assertion during the course of the undercover investigation that in the past, he had refused others' requests for illicit drugs that he could have obtained as a dentist. Jacobs' ignorance or lack of experience in narcotics trafficking, however, is not the focus of our inquiry here; our inquiry is limited to an objective review of the Government's conduct.

In this case, the Government used its informant to gain the confidence of Jacobs and supplied its informant with the narcotics necessary to consummate the transaction with Jacobs and Rasmussen. This, however, is not atypical. However unsavory, the use of an informant and the offer of a reasonable inducement are recognized means of investigating crime. *See Kaminski*, 703 F.2d at 1009; *see also Miller*, 891 F.2d at 1268. Indeed, this circuit has repeatedly observed that "the mere offer to supply contraband, or even the supplying thereof, does not in and of itself constitute outrageous governmental conduct." *D'Antoni*, 874 F.2d at 1220 (citing other cases); *see also Hampton v. United States*, 425 U.S. 484, 491, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976). Unfortunately, the means employed here are often the only effective and practical means of ferreting out drug crime.

Admittedly, the transcripts reveal that Darling was well-versed in the language of narcotics trafficking. So was Rasmussen, the buyer produced by Jacobs. While the transcripts also reveal that Jacobs professed his ignorance and lack of experience in narcotics trafficking, we are not persuaded that the purchase and sale of cocaine requires much technical "know-how" or a high level of sophistication. This especially holds true for someone like Jacobs, who holds an advanced degree and, as a dentist, is capable of prescribing drugs and is undoubtedly somewhat familiar with drug parlance. Thus, this argument, based on the Government's "over-involvement" in the narcotics offenses, fails.

Similarly, Jacobs' attempt to liken the Government's "over-involvement" in this case to that in *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978) fails. In *Twigg*, the government informant initiated contact with the defendants and proposed the idea of establishing a laboratory where they could manufacture narcotics. The Government provided a farmhouse as the location of the illegally operated laboratory, supplied chemicals and glassware, and facilitated the purchase of the bulk of the materials used. In addition, the government informant furnished all of the laboratory expertise and performed the lion's share of the manufacturing while the defendants provided minimal assistance. Under these circumstances, the Third Circuit held that governmental involvement in the criminal activities at issue "reached 'a demonstrable level of outrageousness.'" *Twigg*, 588 F.2d at 380.

Significantly, however, elsewhere in its opinion, the court in *Twigg* drew a distinction between an undercover investigation into the *sale* of illegal drugs and an undercover investigation into an illicit drug *manufacturing* operation. In distinguishing the two, the court explained:

[T]he sale of an illegal drug [is] a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory. In such a situation the practicalities of combating drug distribution may require more extreme methods of investigation, including the supply of ingredients which the drug ring needs.

*Twigg*, 588 F.2d at 378.

In contrast to *Twigg*, this case clearly involved an undercover investigation into the sale of narcotics. Moreover, unlike the defendants in *Twigg*, Jacobs and Rasmussen offered more than minimal assistance to the narcotics transaction in this case, as more fully discussed above. Thus, the defendants' reliance on *Twigg* to support their claim of outrageous government mis-

conduct is inapposite.[5]

Finally, we note that this circuit has rejected claims of outrageous government misconduct under circumstances more egregious than those presented here. *See, e.g., Miller,* 891 F.2d at 1268–69 (where the government informant was employed by government agency on a contingent fee arrangement, continued to use cocaine while in government's employ, and had been sexually intimate with defendant); *Williams,* 858 F.2d at 1225 (where the government informant was persuaded to thwart the government's investigation and to consider harming witnesses); *United States v. Shoffner,* 826 F.2d 619, 626 (7th Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987) (where government informant had familial and sexual relationships with several of the defendants and received a government-financed abortion). By comparison, the Government's investigative acts in this case do not rise to the level of outrageous misconduct. Instead, they may more properly be the subject of an entrapment defense at trial. *See United States v. Valona,* 834 F.2d 1334, 1343 (7th Cir. 1987).[6] Accordingly, at this time, the Court denies Jacobs' motion to dismiss the indictment on grounds of outrageous government misconduct.

### 2. *Rasmussen*

■ Having rejected Jacobs' claim of outrageous government misconduct, we must also reject Rasmussen's claim, which is considerably more attenuated for several reasons. First, Rasmussen arguably lacks standing to assert a claim of outrageous government misconduct. *See United States v. Bogart,* 783 F.2d 1428, 1433 (9th Cir.1986), *vacated on other grounds sub nom. United States v. Wingender,* 790 F.2d 802 (9th Cir.1986) ("A defendant does not have standing to raise a due process violation suffered by a third party"); *cf. Twigg,* 588 F.2d at 382 ("We are reluctant to establish a *per se* rule barring the use of [the outrageous government misconduct] defense to anyone who was not directly induced by a government agent"). Notably, Rasmussen states no independent basis for concluding that the Government acted outrageously. Nor does he contend that he was the target of the Government's outrageous conduct. Instead, Rasmussen rides the coattails of Jacobs' claim, and his arguments parallel those of Jacobs.[7]

Second, assuming, without deciding, that Rasmussen has standing to pursue such a claim, his outrageous misconduct claim necessarily falls not only for the same reasons we rejected Jacobs' claim, but also for the additional reason that Rasmussen's relationship with Darling and the Government was appreciably more tangential than Jacobs' relationship with Darling and the Government. For the record, we note that Rasmussen had absolutely no interaction with Darling until Jacobs solicited Rasmussen's assistance. At that point, the Government's narcotics investigation was underway. In addition, the parties do not dispute that Rasmussen initiated contact with Darling at Jacobs' request. Furthermore, the record abounds with evidence that Rasmussen voluntarily participated in the narcotics transaction. Unlike Jacobs, Rasmussen had no involvement with the

---

**5.** Moreover, this circuit has questioned whether *Twigg* is "still good law in the Third Circuit." *Belzer,* 743 F.2d at 1218 n. 5.

**6.** In a footnote in the memorandum supporting his motion to dismiss, Jacobs also asserts the defenses of entrapment as a matter of law and entrapment as a matter of fact. We note that a defendant can assert the defense of entrapment as a matter of law "only when the lack of predisposition is apparent from the *uncontradicted* evidence." *United States v. Thoma,* 726 F.2d 1191, 1197 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984) (emphasis supplied). As pointed out previously, here, of course, the Government disputes Jacobs' claim of lack of predisposition, thus precluding a finding that the Government entrapped Jacobs as a matter of law. Nevertheless, assuming that the evidence presented at trial supports such a defense, Jacobs may assert the defense of entrapment as a matter of fact at trial.

**7.** Indeed, Rasmussen devotes much of his own motion to dismiss and memoranda to discussing Jacobs' plight. In addition, in his motion to dismiss, Rasmussen specifically adopts Jacobs' motion to dismiss and memoranda to the extent that they apply to Rasmussen.

underworld loan sharks. Thus, Rasmussen cannot even argue that he participated in the narcotics transaction under any sort of pressure, compulsion, or duress. On the contrary, Rasmussen displayed expertise in narcotics trafficking, claimed that he had several different potential customers, and expressed little, if any, reluctance to become involved in the narcotics transaction.

Finally, Rasmussen's outrageous misconduct claim appears to be a thinly disguised claim of private or vicarious entrapment, a defense which the Seventh Circuit has clearly rejected. *See United States v. Manzella*, 791 F.2d 1263, 1269–70 (7th Cir. 1986). For these reasons, we deny Rasmussen's motion to dismiss the indictment on grounds of outrageous government misconduct.

## B. Pre–Indictment Delay

■ As an additional ground for dismissing the indictment, Jacobs and Rasmussen argue that the Government's pre-indictment delay violated their due process rights. This circuit has adopted a two-part test for evaluating the merits of a due process claim based on pre-indictment delay. First, a defendant must establish that he has suffered actual and substantial prejudice. *United States v. Valona*, 834 F.2d 1334, 1337 (citing *United States v. Lovasco*, 431 U.S. 783, 789–90, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977)). Second, if a defendant satisfies the first step, then the court must balance the prejudice to the defendant against the Government's reasons for the delay. *Valona*, 834 F.2d at 1338 (citing *Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048). Generally, the statute of limitations constitutes a defendant's primary source of protection from pre-indictment delay. *See Valona*, 834 F.2d at 1337.

■ Here, however, Jacobs and Rasmussen have not disputed that the Government returned the indictment against them within the applicable statute of limitation. Nor has either of them satisfied the first step of this circuit's two-part test. Although the Government admits that there was a delay of approximately five years in returning the indictment, Jacobs has failed to make any showing of prejudice resulting from that delay. Jacobs merely contends that the indictment should be dismissed because the Government "has never given a valid excuse for [the] delay." It is not the Government's burden, however, to demonstrate a valid excuse for the delay; rather, "[i]t is the defendant's burden to prove that he was prejudiced by the delay." *United States v. Eckhardt*, 843 F.2d 989, 994 (7th Cir.), *cert. denied*, 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988). Jacobs has woefully failed to overcome that burden.

■ Rasmussen has likewise failed to establish actual prejudice resulting from the Government's delay. Rasmussen argues that dismissal is warranted "because of the deliberate conduct of the government in inducing and misleading these defendants to divest themselves of specific recall, and of such tangible evidence as might have existed and could have been preserved some five years ago." Curiously enough, Rasmussen cites no authority to support the proposition that a defendant's memory lapse constitutes actual prejudice. Nor does he specify what type of tangible evidence he will be precluded from presenting because of the Government's delay.

Furthermore, neither Jacobs nor Rasmussen has pointed to any witnesses who have died or are unavailable as a result of the delay. Nor have they otherwise demonstrated actual or substantial prejudice. Absent such a showing, the defendants' respective motions to dismiss the indictment based on the Government's pre-indictment delay must be dismissed.

### III. *Conclusion*

For the reasons outlined, at this time, the Court denies both defendants' motions to dismiss the indictment.[8]

8. If, after all of the evidence has been presented

at trial, the defendants believe that the evidence

supports their respective claims of outrageous government misconduct, they may raise the issue again by way of a motion for judgment of acquittal.